[Cite as *State v. Pickett*, 2017-Ohio-5830.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27457 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3561 |
| | : | |
| DERRICK T. PICKETT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of July, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

JOHNNA M. SHIA, Atty. Reg. No. 0067685, 130 West Second Street, Suite 1624, Dayton, Ohio 45402
        Attorney for Defendant-Appellee

. . . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Plaintiff-appellant, the State of Ohio, appeals from the decision of the trial court, entered on February 8, 2017, to sustain a motion to suppress filed by Defendant-appellee, Derrick T. Pickett.   The State argues that the trial court erred by sustaining Pickett's motion based upon its determination that Pickett had been subjected to an unlawful investigatory stop.   We find that the stop was not unlawful, and we therefore reverse.

### I. Facts

**{¶ 2}** On November 15, 2016, at or shortly before 6:40 p.m., a citizen identifying himself as "Sean" called 911 to report gunfire at the intersection of Middlehurst Lane and Piccadilly Avenue in Dayton.[1]   *See* Tr. of Hr'g on Mot. to Suppress 6-7, 10-11 and Ex. A, Jan. 12, 2017 [hereinafter *Tr. of Hr'g*].   The 911 operator who received the call issued a dispatch that read as follows:

> Male in a red hood[ed sweatshirt] shooting a gun.   Shot three times.

Standing in front of a vacant house with a gate around it.

*Id.* at 9.   In addition, the dispatch included the caller's name and cellular telephone number.[2]   *Id.*   Officers Jason Berger and Douglas Gresham of the Dayton Police

---

[1] Though the parties seem to have adopted the alternate spelling used by the transcriptionist who prepared the transcript of Pickett's motion to suppress hearing, the caller did not indicate how he prefers to spell his name.   Tr. of Hr'g, Ex. A.

[2] When the 911 operator asked the caller for his number, he initially answered "937.830.8800," but he expressed some uncertainty about the final two digits of the four-digit line number.   Tr. of Hr'g, Ex. A.   After asking a person in his presence (faintly audible in the background of the recording) to confirm, the caller indicated that his number was either "937.830.8800" or "937.830.8899."   *Id.*   The 911 operator, unfortunately, misunderstood and thought that the caller said his number was "937.838.8900."   *Id.*

Department, who were nearby in a marked cruiser on routine patrol, responded to the dispatch, along with other officers.  *Id.* at 7 and 41-42.

{¶ 3} Officers Berger and Gresham arrived in the area at approximately 6:43 p.m. *Id.* at 11 and 42.  Roughly two-tenths to one-quarter of a mile (i.e. 1,056 to 1,320 feet, or 352 to 440 yards) from the intersection of Middlehurst Lane and Piccadilly Avenue—as they were approaching the intersection of Middlehurst Lane and Chamberlin Avenue— the officers saw a man in a red hooded sweatshirt walk across the street from 2105 Chamberlin to a white Chevrolet Tahoe, whereupon the man opened the rear driver's side door and reached inside.  *Id.* at 12, 24 and 49-51.  The officers turned from Middlehurst onto Chamberlin to speak with the man, whom they later identified as Pickett, because they had seen no other foot or vehicular traffic in the vicinity and because Pickett was "the first [person they] had seen in the area wearing a red hood[ed] [sweatshirt]."  *Id.* at 12-13, 31 and 43-44.

{¶ 4} Video captured by the officers' cruiser camera shows Pickett standing next to the Tahoe, with its rear driver's side door open, as the officers completed the turn onto Chamberlin.  *Id.* at Ex. B.  At that point, Pickett dropped something onto the ground.[3] *Id.*  With his left hand, he retrieved the object and then reached inside the Tahoe, apparently to place the object on the back seat; his right hand remained visible and outside of the vehicle.  *Id.*  As Pickett reached into the Tahoe with his left hand, he turned his head to look at the oncoming police cruiser, began to draw his left hand out, hesitated, and then reached back into the vehicle with both hands.  *Id.*  Pickett finally drew his hands out of the vehicle as one of the officers approached him, reaching towards

---

[3] The video's resolution is insufficient to permit identification of the object.

him to initiate a pat-down. *Id.* at 15-16, 46-47 and Ex. B. A brief struggled ensued, and the officers put Pickett in handcuffs. *Id.* at 16, 25 and Ex. B.

{¶ 5} In a fashion not reflected on the record, the officers discovered illicit drugs in Pickett's possession (presumably on his person or in his vehicle), resulting in his indictment for possession of a controlled substance in violation of R.C. 2925.11(A). The drugs discovered by the police were the subject of Pickett's motion to suppress.

## II. Analysis

{¶ 6} For its single assignment of error, the State contends that:

THE TRIAL COURT ERRED IN GRANTING PICKETT'S MOTION TO SUPPRESS.

{¶ 7} An appellant has three methods for challenging a trial court's ruling on a motion to suppress: (1) contesting the court's findings of fact; (2) asserting that the court evaluated the facts pursuant to the wrong test; and (3) arguing that the court drew the wrong legal conclusion from the facts. *See In re Long*, 5th Dist. Stark No. 2004-CA-00377, 2005-Ohio-3825, ¶ 3. A challenge of the last variety, which the State brings in the instant matter, requires that an appellate court "independently determine, without deference to the trial court's conclusion, whether the facts meet the [applicable] legal standard." *Id.*, citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994), *State v. Claytor*, 85 Ohio App.3d 623, 627, 620 N.E.2d 906 (4th Dist.1993), and *State v. Guysinger*, 86 Ohio App.3d 592, 621 N.E.2d 726 (4th Dist.1993); *see* Appellant's Br. 1. Here, the trial court sustained Pickett's motion to suppress because it found that the police "officers did not have reasonable suspicion to stop [Pickett], and thus, the stop [was] unlawful." Decision, Order & Entry Sustaining Def.'s Mot. to

Suppress 4, Feb. 8, 2017.

{¶ 8} In "*Terry* [*v. Ohio*], the United States Supreme Court held that a police officer may detain a[] [person] for brief questioning where the officer has a reasonable suspicion that the [person] is engaged in criminal activity." *State v. Shepherd*, 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997), citing *Terry v. Ohio*, 391 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion "is 'vaguely defined as something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *Id.*, quoting *State v. Osborne*, 2d Dist. Montgomery No. 15151, 1995 WL 737913, *4 (Dec. 13, 1995). The "usual requirements of a warrant and probable cause are not implicated by [a *Terry* stop] because an investigatory detention is less intrusive than a formal custodial arrest." *Id.*

{¶ 9} In "determining whether [a law enforcement officer had] reasonable suspicion [in support of a *Terry* stop], we sacrifice certainty for flexibility and look to the 'totality of the circumstances.' " *Id.* at 365, quoting *State v. Bobo*, 37 Ohio St.3d 177, 181, 524 N.E.2d 489 (1988). This "typically requires [a showing] that the officer making the stop was [personally] aware of sufficient facts to justify it," although "when an investigative stop is made in sole reliance upon a police dispatch, different considerations apply." (Citation omitted.) *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999). Where "an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis omitted.) *Id.* at 298.

{¶ 10} The dispatch on which the police officers relied in this case resulted from a telephone tip. A "telephone tip can, by itself, create reasonable suspicion justifying an

investigatory stop where the tip has sufficient indicia of reliability." *Id.* at paragraph one of the syllabus. Indicia of reliability include "the [informant's] veracity and [the] basis of [the informant's] knowledge." (Citations omitted.) *Shepherd*, 122 Ohio App.3d at 366.

{¶ 11} In "examining the 'weight and reliability' of a tip," the Ohio Supreme Court recognizes "three types of informants: (1) the anonymous informant; (2) the known informant (typically a[] [person] with criminal associations who has previously provided reliable information); and (3) the identified citizen informant." *State v. Carrocce*, 10th Dist. Franklin No. 06AP-101, 2006-Ohio-6376, ¶ 32, citing *Weisner*, 87 Ohio St.3d at 300. An "identified citizen informant is [usually] accorded a 'greater degree of reliability' [than an anonymous tipster] and 'therefore, a strong showing as to the other indicia of reliability [i.e. indicia other than the classification of the informant] may be unnecessary.' " *See id.*, quoting *Weisner*, 87 Ohio St.3d at 300-301. When "a citizen-informant * * * is victimized or merely witnesses a crime and reports it out of a sense of civic duty, the police may be entitled to presume that the informer is reliable." (Citations omitted.) *Id.*

{¶ 12} In the case at hand, we concur with the trial court's finding that the tipster who called 911 was an informant of the third kind, an identified citizen informant; he provided his first name and his cellular telephone number.[4] *See e.g. id.* at ¶ 33; *Weisner*, 87 Ohio St.3d at 301-302; Decision, Order & Entry Sustaining Def.'s Mot. to Suppress 3. Though "a tip might be anonymous in some sense," it may have "certain other features, either supporting reliability or <u>narrowing the likely class of informants</u>, so that the tip does provide [a] lawful basis for some police action." (Emphasis added.) *Florida v. J.L.*, 529 U.S. 266, 275, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (Kennedy, J., concurring); *see*

---

[4] *See supra* note 2.

*also United States v. Terry-Crespo*, 356 F.3d 1170, 1174-1175 (9th Cir.2004). By providing his first name and cellular number, the tipster at the very least "place[d] his anonymity at risk," which favors his classification as an identified informant. *See J.L.* 529 U.S. at 276; *Terry-Crespo*, 356 F.3d at 1176. Classifying the tipster as identified, however, "does not itself determine the outcome of this case." (Citation omitted.) *Carrocce*, 2006-Ohio-6376, ¶ 34.

{¶ 13} According to the State, what the police officers discovered when they encountered Pickett at 2105 Chamberlin, "considered with the report given by the identified citizen informant, established reasonable suspicion." Appellant's Br. 7. The State observes that the officers found Pickett a short distance away from the intersection of Middlehurst and Piccadilly; that Pickett was wearing a red hooded sweatshirt at the time; that "there was no other foot or vehicle traffic" in the vicinity; that the "encounter [with Pickett] took place about four minutes after the officers received the dispatch"; that Pickett "appeared to be either placing something down or reaching for something" as the officers approached him; and that the stop "took place in a high drug-crime and gun-crime area." *Id.* at 6-7. Moreover, the State opines that expecting the officers to have " 'investigate[d] further rather than immediately detain[] Pickett' " is not reasonable because of the possibility that Pickett was armed and dangerous. *See id.* at 9.

{¶ 14} Pickett argues that the tipster, identified citizen informant or not, provided insufficient detail to satisfy the reasonable-suspicion standard, and he argues that "the officers failed to corroborate the substance of the tip." Appellee's Br. 8-9. Pickett faults the tip itself because it described the alleged shooter only in terms of gender and one article of clothing, omitting details such as the suspect's age, height, race and weight, as

well as any description of the weapon used. *Id.* at 9. Regarding the lack of corroboration, Picket notes that the "caller-in did not mention a vehicle associated with the suspect"; that the officers "did not hear any shots fired" despite being "only minutes away from the scene"; that the officers "ignor[ed] [the fact] that the location [where they found Pickett] was different [from that] reported in the dispatch"; that Pickett "was walking from an occupied home with its lights on, not a vacant house with a [fence] around it"; and that the officers did not see Pickett "carrying a weapon or [engaging in] anything remotely close to criminal activity." *Id.* at 9-10.

{¶ 15} In view of the totality of the circumstances, we find that the tip gave rise to a reasonable suspicion of criminal activity such that the police officers acted appropriately in detaining Pickett. The 911 operator and the police officers were entitled to treat the tip as reliable because it came from an identified citizen informant, and the nature of the tip indicates that the tipster personally witnessed a person firing a gun near the intersection of Middlehurst and Piccadilly. *See Terry-Crespo,* 356 F.3d at 1176-1177. Although the tipster could offer few descriptive details about the shooter, he explained to the 911 operator that he could not discern the shooter's race because of the hooded sweatshirt and that he could not describe the shooter's gun because—at 6:40 p.m. in November—darkness prevented him from seeing the gun. *See* Tr. of Hr'g 13 and Ex. A-B. The tipster seems to have acted in good faith and to have provided as much detail as conditions permitted.

{¶ 16} Pickett's argument that the police officers failed to corroborate the tipster's information appears to rely largely on the premise that the shooter, having fired his gun three times, would wait patiently at the intersection of Middlehurst and Piccadilly for

officers to arrive and place him under arrest. Assuming, however, that the shooter decided to leave the area after firing his gun, he could easily have travelled two-tenths to one-quarter of a mile on foot within three to four minutes, and the officers encountered Pickett two-tenths to one-quarter of a mile away from the intersection of Middlehurst and Piccadilly some three to four minutes after the tipster called 911. This would, as well, explain why the officers found Pickett standing next to a vehicle and not in front of a vacant house. Though this would not explain why the officers did not hear shots being fired, the officers need not have personally witnessed the incident to have had reasonable suspicion in light of the information provided by the tipster.

{¶ 17} Pickett also argues that the officers were not justified in stopping him because they did not see him carrying a weapon, because they did not see him engaging in criminal activity, and because they did not see any other pedestrian or vehicular traffic. Appellant's Br. 11, citing Tr. of Hr'g 13, 31 and 43. Yet, because the officers were relying on the information provided in the dispatch, the "facts precipitating the dispatch," and not their observations of Pickett prior to the *Terry* stop, control our analysis. *See City of Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999); *see also e.g. Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir.2004). For that matter, the absence of pedestrian and vehicular traffic in the area so shortly after the tipster's 911 call supports, rather than undermines, the conclusion that the officers were justified in stopping Pickett.

{¶ 18} In addition, Pickett notes that "[c]oincidentally, another male in a red hood[ed] [sweatshirt] was, indeed, observed in the vicinity that evening." Appellee's Br. 11. Police observed the second man 40 or more minutes afterward, however, meaning

that this incident is essentially irrelevant to the question of whether the police officers had reasonable suspicion to stop Pickett when they did.   Tr. of Hr'g 31.

{¶ 19} At oral argument, Pickett took the position that because the tipster had provided relatively few verifiable details, the police officers should have undertaken an investigation that would not have implicated the Fourth Amendment before they detained him (e.g. continuing to observe him from a distance).   This argument is unpersuasive because of the nature of the tipster's information.   When the officers spotted Pickett across from 2105 Chamberlin, they were searching for a man armed with a gun who had, minutes earlier, fired three rounds on or near a public roadway.   Further investigation of Pickett might not only have endangered the officers themselves, but others in the area, such as the occupants of the adjacent residences.   *State v. Shepherd*, 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997).   Moreover, Pickett was standing next to a vehicle at the time, and the officers could, quite reasonably, have been concerned with the possibility that Pickett could thwart any additional investigation simply by driving away. (Citation omitted.)   *State v. Works*, 2d Dist. Montgomery No. 19557, 2003-Ohio-4720, ¶ 32 (commenting that "the mobility factor supports some immediate action that otherwise might not be required").

{¶ 20} Case law suggests that a 911 call reporting an ongoing emergency is "entitled to greater [credence] than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with [rapidity]."   *Terry-Crespo*, 356 F.3d at 1176, citing *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir.2002), *cert. denied*, 537 U.S. 1161, 123 S.Ct. 966, 154 L.Ed.2d 897 (2003); *see also e.g. United States v. Edwards*, 761 F.3d 977, 984-985 (9th Cir.2014).   In the instant case, the tipster,

an identified citizen informant, reported activity that qualified as an ongoing emergency, and the Dayton Police Department could not have been expected to disregard the seriousness of the report. Although the tipster described the suspected shooter only in terms of gender and one article of clothing, the prevailing darkness allowed the tipster to see little else, and given the promptness with which the police officers responded to the 911 dispatch, Pickett's proximity to the reported location of gunshots at the time the officers encountered him, and the fact that he was wearing the red hooded sweatshirt described by the tipster, we conclude that the officers had reasonable suspicion warranting a *Terry* stop. The State's assignment of error is sustained.

### III. Conclusion

{¶ 21} We find that Pickett was not subjected to an unlawful investigatory stop. Therefore, the trial court's order of February 8, 2017 sustaining Pickett's motion to suppress is reversed, and the case is remanded to the trial court for further proceedings consistent with this decision.

. . . . . . . . . . . .

HALL, P.J., concurs.

DONOVAN, J., dissenting:

{¶ 22} I disagree. "Because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike." *Illinois v. Gates,* 462 U.S. 213, 290, 103 S.Ct. 2317, 2359-60, 76 L.Ed.2d 527 (1983) (BRENNAN, J., dissenting).

{¶ 23} In *Florida v. Royer,* the court found that during an investigative detention, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983).

{¶ 24} "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an immediate response. *** A brief [investigative] stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams,* 407 U.S. 143, 145-146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616-617 (1972).

{¶ 25} Although police are given fair license to enforce the law for the protection of the community, we must also safeguard citizens from rash and unreasonable interference with privacy based on uncorroborated facts. In this instance, the fact that Pickett was wearing a red hooded sweatshirt simply did not justify his seizure and immediate pat down. A brief investigative stop may have been justified, but not what the police did here. The conduct of the police surely was not the least intrusive means available to verify and/or dispel suspicion of criminal conduct.

{¶ 26} Pickett was three blocks from the reported incident, outside a house which was not vacant, with an open door and light on. As the trial court noted, the 911 caller did not provide any detail on the suspect including his race, height or weight, only the fact that he wore a red hooded sweatshirt. The initial observation of Pickett by police did not

yield any corroborating information, no gun was observed, and his conduct outside his vehicle cannot be characterized as suspicious. This case does not warrant a reversal pursuant to the jurisprudence of *Terry v. Ohio* or *Florida v. J.L.* As emphasized in *J.L.*, "the anonymous call concerning J.L., provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *J.L.* 529 U.S. at 271, 120 S.Ct. 1375, 146 L.Ed.2d 254. The same analysis is true here. The officers lacked reasonable individualized suspicion. In requiring that Pickett's seizure be based on at least some corroborated evidence of criminal conduct, the trial judge was faithful to the Fourth Amendment principle that law enforcement officers must reasonably suspect a person of criminal activity before they can detain and search him. We should be equally faithful to the Fourth Amendment protections afforded by Ohio and United States Constitution.

**{¶ 27}** I would affirm.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Johnna M. Shia
Hon. Gregory F. Singer